In The
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TODD M. SCHULZE**, | : | |
| Plaintiff, | : | Civil Action No. **02-155E** |
| vs. | : | |
| **CLAYTON E. SCHULZE** and **PATRICIA SCHULZE**, husband and wife, | : | |
| | : | |
| Defendants, | : | |
| vs. | : | |
| **TODD M. SCHULZE** and **BRANDI SCHULZE**, husband and wife; and **MR. T's RE-BAR, INC**., | : | |
| | : | |
| | : | |
| Counterclaim Defendants. | : | |

_____/

## PLAINTIFF'S SECOND AMENDED PRETRIAL NARRATIVE STATEMENT

Plaintiff Todd M. Schulze, by his undersigned counsel, hereby submits this Amended Pretrial Narrative Statement pursuant to Local Rule 16.1.4. of the Local Rules of this Court.

This Pretrial Narrative Statement is amended to remove discussion of the claims between the Defendants and the Counterclaim Defendants pertaining to loan accounts, including related stipulations, exhibits and legal issues, as the claims arising from loan accounts have been severed from Plaintiff's claims pertaining to patents and related fiduciary duties for submission to binding arbitration. This Amended Pretrial Statement also reflects the fact that patents have issued for the "Stud Extension" ("Weldment Plate Spacer Support"), which was not the case when Plaintiff filed his original pretrial statement.

With respect to the patent infringement count, the Plaintiff has dropped his claim for damages based upon the inability to close a sale of the patent rights.  The Plaintiff's damages for patent infringement will be limited to lost profits on the sale of patented items by the Defendants.

Testimony of a representative of FUKUVI USA, Inc., taken at the direction of the Court following the pretrial conference, has also caused the Plaintiff to drop a claim for royalties due to Clayton Schulze's unauthorized amendment to the method of calculation of those royalties.  All of these changes and corrections are noted herein.

*LR. 16.1.4.A.1 -Narrative Statement Of Material Facts That Will Be Offered At Trial*

<u>THE NATURE OF THE CLAIMS</u>:

The Plaintiff's claims involve three devices invented by the Plaintiff, all of which are used in the course of forming pre-cast concrete walls as part of what is called the "tilt/up" method of constructing "big box" commercial buildings.  The three devices at issue are called the "Slab-Saver," the "Stud Extension"(also called a "Weldment Plate Spacer Support") and "Square Tie Wire."

At the time of the commencement of this litigation, United States Patent Number 5,829,213 had been issued for the "Concrete Slab Saver" (which is also referred to simply as the "Slab Saver").  The inventors listed on the patent are Clayton E. Schulze and Todd M. Schulze.

At the time of the commencement of this litigation, applications for patents were submitted to the United States Patent and Trademark Office for the "Stud Extension," but no patent had yet issued.  As is more fully set forth below, while the patent application was pending, the parties submitted various materials in their own names to the United States Patent Office.  Ultimately, two patents pertaining to the "Stud Extension" issued.  The first patent, No. US 6,820,390, was issued on November 23, 2004 in the name of Todd M. Schulze alone.  The

second patent, No. US 6,823,635, followed on November 30, 2004, in the joint names of Todd M. Schulze and Clayton E. Schulze.

An application for a patent for the "Square Tie Wire" was submitted to the United States Patent Office, but it was never prosecuted to completion. For reasons set forth below, that patent application had to be abandoned, and no patent for the "Square Tie Wire" ever issued.

The Plaintiff's causes of action arise out of two oral agreements between the Plaintiff and Clayton Schulze. Under one agreement, Clayton Schulze promised to assist Todd Schulze by providing his son financial and administrative assistance in obtaining patents for Todd Schulze's inventions, and Todd Schulze promised to repay Clayton Schulze out of royalties later earned on the patents. Under a separate agreement, Todd Schulze and Clayton Schulze agreed to cooperate in the commercial exploitation of the "Slab Saver" patent, and to divide any profits from that joint venture equally.

The Plaintiff maintains that by virtue of these agreements between the parties, Defendant Clayton Schulze assumed fiduciary responsibilities toward the Plaintiff. It is the Plaintiff's position that the Defendant was a fiduciary of the Plaintiff because:

(1)     Under Pennsylvania law, individuals engaged in a joint adventure are partners, and partners are agents and fiduciaries of the partnership and of each other with respect to all business within the scope of the joint undertaking;

(2)     Clayton Schulze assumed responsibility for collecting, disbursing and accounting for funds belonging to the Plaintiff, under circumstances where he knew the Plaintiff was not, as a practical matter, in a position to collect or track receipts or make disbursements, and that the Plaintiff was relying upon the Defendant's honesty, integrity, skill and judgment; and

(3)     Clayton Schulze acted as an agent for Todd Schulze in the matter of obtaining patent

counsel and otherwise administering the applications for patents on the Plaintiff's

inventions.

The Plaintiff maintains that Defendant Clayton Schulz breached his fiduciary obligations

toward the Plaintiff both in the course of administering the patent application process and in the

course of the joint commercial exploitation of the Plaintiff's patent.  The alleged breaches

included self-dealing, and breaches of the duties of honesty, candor and loyalty.

With respect to the patent application process, the Plaintiff maintains the Defendant

breached fiduciary obligations toward the Plaintiff in that the Defendant:

(1)     Insinuated his own name on to each of the patent applications as a co-inventor of each

device, when the Defendant was not a co-inventor of any of the devices;

(2)     Failed and refused to keep the Plaintiff informed with respect to material facts and

developments concerning the patent applications, and in some respects intentionally

misinformed the Plaintiff;

(3)     Administered the patent applications as though they were his own property, adding

and removing claims and making other decisions without the knowledge or approval

of the Plaintiff;

(4)     Interfered with the Plaintiff's efforts to correct the records at the United States Patent

and Trademark Office as to the true inventorship of each device;

(5)     Represented to third parties that the Defendant was a co-inventor of the devices

invented by the Plaintiff, when the Defendant was not and is not a co-inventor; and

(6)     Sold patented articles to third parties under the false representation that "Hobo

Construction" or Clayton Schulze were the lawful owners of the patent right to those

articles.

With respect to the agreement for the joint commercial exploitation of the Plaintiff's

"Slab Saver" device, and the agreement to administer the patent application process for the "Stud

Extension" device, the Plaintiff maintains the Defendant breached fiduciary obligations toward

the Plaintiff by:

(1)     Failing to keep complete or accurate records of account pertaining to funds disbursed

or received as a result of the commercial exploitation of the "Slab Saver" and "Stud

Extension;"

(2)     Failing to inform the Plaintiff when funds were on hand that the parties agreed should

be paid to the Plaintiff;

(3)     Exercising personal dominion and control over funds collected by the Defendant

which were the property of the Plaintiff, by depositing them into accounts established

by the Defendants and which were in the joint names of the Defendants and the

Plaintiff, rather than paying the funds over to the Plaintiff;

(4)     Defalcating funds collected by the Defendant which were the property of the Plaintiff,

and applying those funds to pay debts which the Defendant claims were owed to the

Defendant jointly by the Plaintiff and the Plaintiff's wife;

(5)     Failing entirely to remit $4,125 in royalty payments collected by the Defendant,

which is rightfully the property of the Plaintiff;

(6)     Attempting to materially change the terms of a contract with a third party for a license

to manufacture the "Slab Saver" without the knowledge or permission of the Plaintiff,

and in the process forging the Plaintiff's signature on an amendment to the contract in

order to put the Defendant's plan into effect;

(7)     Representing to third parties that "Hobo Construction," a fictitious name under which

the Defendants trade and do business, was the sole owner of the patent issued on the

"Slab Saver" device, when such was not the case;

(8)     Entering into "exclusive distributorship" agreements, in the name of "Hobo

Construction," with at least two distributors of concrete construction products,

purporting to own the "Slab Saver" patent, without the knowledge or permission of

Todd Schulze;

(9)     Demanding payment of royalties from third parties in connection with the

manufacture of the devices invented by the Plaintiff, to the exclusion of any royalty to

the Plaintiff; and

(10)    Filing this law suit, alleging hundreds of thousands of dollars in damages for alleged

patent violations against the Plaintiff and the Plaintiff's wife, with no basis at all in

law or in fact for asserting any such claims and with no basis at all for the amounts of

damage asserted.

## FACTUAL HISTORY OF THE DISPUTE.

In support of these claims, the Plaintiff will adduce evidence to prove that for more than

20 years, Todd Schulze has been in the construction industry, specializing in the construction and

erection of pre-cast concrete "tilt/up" walls for large structures.  Todd Schulze has personally

supervised the erection of approximately 30,000 "tilt/up" panels for structures as large as

750,000 square feet, and is intimately familiar with the "tilt/up" construction industry, as well as

the tools, methods and supplies used in such construction.  Clayton Schulze has never worked in

the "tilt-up" construction industry, and is not skilled in the art. In fact, Clayton Schulze knows

almost nothing about "tilt/up" construction.

In 1993, while working on a job in Norman, Oklahoma, Todd Schulze came up with the

concept for the "Slab Saver." As stated in Patent No. US 5,829,213, the "Slab Saver" is a plastic

insert which can incorporated into pre-cast concrete walls, and which will reduce or eliminate

damage to poured concrete floors which when a pre-cast concrete wall panel is "tipped up" with

a crane and hoisted into place. The actual claim, as stated in the patent, is:

> . . . longitudinally extending member forming a longitudinally extending bottom
> corner of a wall panel in tilt/wall construction, said member being attached to said
> wall panel in engaging relation to said concrete floor, and said member being
> comprised of material softer than said concrete floor such that damage to said
> concrete floor is reduced during movement of said wall panel across said concrete
> floor.

In the course of this litigation, Defendant Clayton Schulze has admitted the "Slab Saver"

device was initially conceived by Todd Schulze alone. It was, however, impossible as a practical

matter for Todd Schulze to prosecute patent applications on his own. This is in part because

Todd Schulze's trade requires him to travel extensively, living in motels in distant, often rural

areas for weeks at a time. It was also due in part to the fact Todd Schulze had no experience in

applying for patents, and lacked the financial resources to prosecute a patent application on his

own.

Clayton Schulze had applied for a number of patents before being approached by Todd

Schulze for assistance in patenting the Slab Saver. Clayton Schulze had also founded an

organization of inventors known as the Pennsylvania Inventor's Association. Clayton Schulze

was therefore familiar with the patent application process.

Clayton Schulze also had the financial resources to retain patent counsel, pay application fees and otherwise prosecute a patent application. For these reasons, Todd Schulze approached Clayton Schulze in 1997, seeking assistance in patenting the "Slab Saver."

Clayton Schulze agreed to finance the patent application process, and handle the administrative end of the process, indicating he was doing so in order to help his son. The parties agreed that any funds Clayton Schulze would advance in the course of the patent application process would be repaid to Clayton Schulze out of any royalties or other money earned from the patent.

Pursuant to his agreement with Todd Schulze, Clayton Schulze initially attempted to prosecute the patent for the Slab Saver himself, without the assistance of legal counsel. In that application, Clayton Schulze listed only himself as a co-inventor. Todd Schulze was unaware that his father had listed himself as the applicant for the patent.

The initial application submitted by Clayton Schulze without the assistance of counsel rejected by the U.S. Patent Office due to technical defects in the application. Following the rejection of the initial application, Clayton Schulze retained William S. Van Royen, of the firm of Pettis & Van Royen, P.A. of Tampa, Florida, to prepare amendments to the application for the "Slab Saver" patent.

Throughout the entire patent application process concerning the "Slab Saver," only Clayton Schulze dealt with Attorney Van Royen. Todd Schulze never spoke to attorney Van Royen directly about the application for the Slab Saver patent, and all documents and information passed between Todd Schulze and Attorney Van Royen were passed through Clayton Schulze.

The patent application for the Slab Saver was submitted, with the assistance of Attorney Van Royen, on May 1, 1995.  Patent No. 5,829,213, covering the Slab Saver, issued on November 3, 1998, naming both Todd and Clayton Schulze as co-inventors.  This indicates that at some point Clayton Schulze did cause his son's name to be added to the patent application.

In 1998, while the "Slab Saver" patent was pending, Todd Schulze also invented the "Stud Extension" and "Square Tie Wire."  Defendant Clayton Schulze has admitted these devices were also initially conceived by Todd Schulze alone.

As he had done with respect to the "Slab Saver," Todd Schulze approached his father and sought assistance in obtaining patents for the "Stud Extension" and "Square Tie Wire."  Once again, Clayton Schulze agreed to assist Todd Schulze in obtaining patents for the "Stud Extension" and "Square Tie Wire," on condition that any funds he would advance would be repaid out of royalties or other sums realized from the exploitation of those patents.

For purposes of applying for the patents on the "Stud Extension" and "Square Tie Wire," Clayton Schulze retained a patent attorney from Fairview, Pennsylvania, Richard K. Thomson, Esq.  As had been the case with Attorney Van Royen in Florida, only Clayton Schulze dealt with Attorney Thomson.  Todd Schulze never spoke to Attorney Thomson directly, and all the documents and information passed between Todd Schulze and Attorney Thomson were passed through Clayton Schulze.

During the application process, Clayton Schulze urged his son to have additional names added to the patent applications for the Stud Extension and the "Square Tie Wire".  He made a number of arguments to Todd Schulze to convince Todd Schulze to do this.

In violation of his duties of candor toward Todd Schulze, Clayton Schulze falsely reported to Todd Schulze that Attorney Thomson had advised that it was prudent to put the

names of Clayton Schulze and Brandi Schulze on the applications for patents on the "Stud

Extension" and "Square Tie Wire" because a patent held jointly in the names of husband and

wife would be protected from attachment by a creditor in the future.  Clayton Schulze also

falsely represented that by adding names to the patent application it made it more likely the

patent would be issued, and that because Clayton Schulze was a "senior citizen" the U.S. Patent

and Trademark Office would issue the patent more quickly.

        None of these representations were true, and in any case Todd Schulze did not consent to

the addition of any names to the patent applications.  To the contrary, Todd Schulze argued with

this father over the issue, and insisted that the application be made in his own name.

Notwithstanding his son's objections, however, Clayton Schulze reported to Attorney Thomson

that he, Clayton Schulze, as well as Brandi Schulze, had conceived of certain design

improvements to the Stud Extension and the "Square Tie Wire," and he instructed Attorney

Thomson to put all three names on the patent application.

        It is undisputed that Brandi Schulze was not an inventor or co-inventor with respect to

either the "Stud Extension" or "Square Tie Wire," and that she never claimed to be.  Clayton

Schulze knew for certain that Brandi Schulze was not an inventor when he told Attorney

Thomson that she was an inventor.  The Plaintiff maintains that Clayton Schulze also knew at the

time the instructed Attorney Thomson to add his name to the applications that he, Clayton

Schulze, was not an inventor of either device, although that point is disputed by the Defendant.

        Attorney Thomson carried out Clayton Schulze's instructions, and added the names of

Clayton Schulze and Brandi Schulze as co-inventors on the applications for the patents for the

Stud Extension and the "Square Tie Wire".  This is how it came about that Clayton Schulze's

name was associated with the Stud Extension and the "Square Tie Wire" as a co-inventor.

Clayton Schulze thus misinformed Attorney Thomson as to the true inventorship of each device, misinformed his son regarding how he was administering the patent application process, and filed false declarations of inventorship with the U.S. Patent and Trademark Office naming himself and Brandi Schulze as co-inventors of the "Stud Extension" and "Square Tie Wire." None of this was done with Todd Schulze's knowledge or consent.

While the Slab Saver patent was pending, and after it issued, Clayton Schulze attempted to market and sell units of the Slab Saver to construction companies and distributors of construction supplies. Todd Schulze was aware of the fact his father was attempting to sell the product, and in fact was providing his father with leads regarding who within the industry might be interested in purchasing the product. Todd Schulze did this with the expectation the devices were being sold under a patent naming him alone as the inventor, and that the money derived from such sales would be used to reimburse his father for the costs of obtaining the patents, and other expenses Clayton Schulze had incurred in having the devices manufactured. What Todd Schulze did not know was that Clayton Schulze was marketing the product as an article with respect to which a company called "Hobo Construction" held the patent, declaring the patent to be the property of "Hobo Construction."

"Hobo Construction" is a fictitious name through which Clayton and Patricia Schulze conduct business. Although it is not registered with the Secretary of State of the Commonwealth of Pennsylvania as such, the Defendants admit it is in fact a trade name employed by them, and not a corporation, limited liability company or other form of business entity with an existence separate and apart from Clayton and Patricia Schulze personally.

In this regard, Clayton Schulze, represented himself to be the "General Manager" of "Hobo Construction," and purported to give a distributor, Sheplers, an "exclusive sales

franchise" for the Slab Saver within the State of Georgia for one year starting on August 26, 1999. In the process, Clayton Schulze represented that "our Slab Saver" is a Patented product," giving the false impression that Hobo Construction was the holder of the patent, and had the legal right to issue exclusive licenses for the product.

Clayton Schulze also undertook, on behalf of "Hobo Construction," to negotiate an "Exclusive Marketing Agreement" with another distributor, Panel Systems, Inc. This agreement was consummated on November 23, 1999. In the process, Clayton Schulze falsely represented that "HOBO is the owner of a product called SLAB SAVER, (Patent #05-829,213) for use in 'tilt up' and other concrete type construction."

Clayton Schulze engaged in similar acts of self-dealing with respect to the patent for the Stud Extension while the patent application for the Stud Extension was still pending. In this regard, Clayton Schulze marketed and sold units of the Stud Extension to construction companies and distributors of construction supplies, and kept the profits for "Hobo Construction."

As was the case with the Slab Saver, Todd Schulze was aware of the fact his father was attempting to sell the product, and was providing his father with leads regarding who within the industry might be interested in purchasing the product. As was the case with the "Slab Saver," Todd Schulze had the expectation that the money derived from such sales as there were would be used to reimburse his father for the costs he incurred in connection with the patent application process, and other expenses Clayton Schulze had advanced for molds and similar expenses.

The Plaintiff intends to prove Clayton and Patricia Schulze derived at least $68,724.74 trough the sale of the "Slab Saver" during 1999 and 2000, and at least $12,429.59 in income through the sale of the "Stud Extension" during 2002 and 2003.

In early 1999, Clayton Schulze was approached by a corporation, Fukuvi U.S.A., Inc. (hereinafter "Fukuvi"), about the possibility of obtaining an exclusive license to sell the "Slab Saver."  In this regard, Todd and Clayton Schulze agreed to cooperate in licensing the "Slab Saver" patent to Fukuvi.  On January 22, 2001, following a period of negotiations, an "Exclusive License Agreement" was entered into between Fukuvi for one part, and Todd and Clayton Schulze for the other part.

Under the License Agreement with Fukuvi, Todd and Clayton Schulze were to be paid royalties by Fukuvi.  The royalties were based upon the number of "units" of the "Slab Saver" sold.  A "unit," as defined in "Attachment A" to the License Agreement, is a cut length of the product 24 inches long.  However, at some time in May or June, 2001, Clayton Schulze agreed with Fukuvi representatives to delete reference to a "unit" of the "Slab Saver" being 24 inches long, and making the definition of the "unit" upon which royalties were based "a cut length." This amendment would have materially changed the basis upon which royalties were calculated under the License Agreement, which would have been to the economic benefit of Fukuvi and economic detriment to Todd and Clayton Schulze.

Clayton Schulze agreed to this Amendment to the License Agreement without the knowledge or consent of Todd Schulze.  Clayton Schulze signed a written "Amendment to Agreement of January 22, 2001," and forged the signature of Todd Schulze on that document. The Defendant concealed these actions from Todd Schulze.  For unknown reasons, however, Fukuvi maintains it never put this amendment into effect, and continued to pay royalties based upon a 24-inch "unit."

The evidence at trial will demonstrate that Fukuvi initially delivered all royalty payments to "Hobo Construction," which funds were taken by Clayton and Patricia Schulze.  Starting in

April 25, 2002, however, Fukuvi began dividing the royalty payments, sending half the payment to "Hobo Construction," and half the royalty payment to Todd Schulze directly.    Exactly $25,000 in royalties were paid by Fukuvi to "Hobo Construction" before Fukuvi began splitting the royalty payments.  Half of that, $12,500, belonged to Todd Schulze.

Between January, 2001 and August, 2001, Todd Schulze did not receive his share of royalties, and the little information his father gave him about the disposition of the royalty payments did not satisfy him the payments were what he would expect in light of the level of commercial activity with Fukuvi.  Todd Schulze made inquiry of his father, but Clayton Schulze was evasive in his responses.  Clayton Schulze did tell Todd Schulze that funds were being used to pay expenses incurred in obtaining the patents and in marketing the Slab Saver, but Clayton Schulze failed to actually account for royalty payments and expenses associated with the sale of Slab Saver.  This failure to make a good accounting was increasingly the source of friction between Todd and Clayton Schulze.

It is now evident that Clayton Schulze did not keep complete or accurate books of account pertaining to the business he agreed to do jointly with his son.  Although Clayton Schulze claims to have kept track of expenses, royalty payments and other income by keeping copies of receipts and cancelled checks, when called upon to do so Clayton Schulze has been unable to give a full and complete accounting.

At the end of August, 2001, the dispute came to a head when Brandi Schulze saw a photocopy of a check from Fukuvi which had been made payable to the order of "Hobo Construction/Clayton Schulze."  Todd inquired of his father why the check was written in that manner, and Clayton told the Plaintiff that the Defendants had opened accounts in the names of

Todd and Brandi Schulze, and the Defendants were depositing Todd's share of royalty payments into those accounts, "for safe keeping."

This precipitated an argument, at which time the Plaintiff forcefully insisted upon seeing the records of transactions concerning the "Slab Saver." In the course of the argument, Clayton Schulze revealed a number of documents to his son which showed that Clayton Schulze had been representing to purchasers of the Slab Saver that "Hobo Construction Company" was the owner of the "Slab Saver" patent, that he had offered "exclusive sales franchises" to third parties to sell the Slab Saver, and that on some occasions Clayton Schulze had sold the Slab Saver and the Stud Extensions and kept the proceeds.

The evidence will establish that between January, 2001 and April 25, 2002 (before Fukuvi began dividing the royalty payments) Fukuvi USA, Inc. paid $25,000 to "Hobo Construction," and nothing to Todd Schulze. In 2001 and 2002, Clayton and Patricia Schulze deposited $6,250 of the royalty payments into a savings account and two IRA accounts held in the joint names of Todd Schulze or Brandi Schulze and Patricia Schulze. An additional $1,132 was taken by the Defendants and credited against a loan the Defendants made to Todd and Brandi Schulze, and $993 was used to pay expenses in connection with the patent applications. This leaves $4,125 of Todd Schulze's share of the royalty payments till in the hands of the Defendants.

In November, 2001, while the application for the patent on the Stud Extension was still pending, Todd and Brandi Schulze decided to begin showing the "Stud Extension" to customers. They wanted to show the product at trade shows, starting in January, 2002. In order to make some of the product, they sought to have a prototype mold made. To that end, Clayton Schulze

paid $7,500 for a prototype mold.  The prototype mold was then delivered to a manufacturer, Springfield Plastics, and Todd and Brandi Schulze ordered 10,000 pieces of the Stud Extension.

However, before the product was completed and delivered to Todd Schulze, the Plaintiff learned that Clayton Schulze had demanded that Springfield Plastics pay Clayton Schulze ten cents for every "Stud Extension" manufactured.  As a direct result of this demand on the part of Clayton Schulze, Springfield Plastics refused to manufacture any more of the "Stud Extensions." The prototype mold was then returned to Clayton Schulze, who has since retained custody of the mold.

In February, 2002, Todd Schulze was contacted by a contractor who was interested in purchasing the Stud Extensions.  The contractor told Todd Schulze he had attempted to buy the Stud Extensions from "Hobo Construction," but the price per piece was excessive.  This prompted Todd Schulze to contact his father, and an argument ensued about the price Clayton wanted to charge for the Stud Extensions.  When Todd insisted he could charge whatever he wanted for the Stud Extensions, Clayton Schulze falsely represented he had been advised by Attorney Thomson that because Clayton Schulze was financing the application process, he had an interest in the patent.

Clayton Schulze's claim that Clayton Schulze owned half of the patents prompted Todd Schulze to seek independent legal counsel.  The first attorney contacted by Todd Schulze suggested he see attorney Van Royen, because Attorney Van Royen was the attorney responsible for submitting the Slab Saver patent application.  It was at Attorney Van Royen's office, in February, 2002, that Todd Schulze first discovered that Clayton Schulze's name was on the patent for the Slab Saver.

In light of the conflict of interests, Attorney Van Royen referred Todd Schulze to another patent attorney, Dennis G. LaPointe, Esq., a member at that time of the firm of Mason & Associates, P.A. of Clearwater, Florida. Mr. LaPointe explained to the Plaintiff that only the true inventor of a device may lawfully be submitted on a patent application, and the various explanations given by Clayton Schulze were inadequate for one to be considered a named inventor. Mr. LaPointe also obtained copies of the applications for the Stud Extension and the "Square Tie Wire" patents. It was then that Todd Schulze discovered that Clayton Schulze and Brandi Schulze's names had been put on those patent applications.

Attorney LaPointe undertook to have Clayton Schulze and Brandi Schulze's names removed from the patents, and to protect Todd Schulze's interests with respect to the Fukuvi contract. Clayton Schulze initially refused demands by Mr. LaPointe that Clayton cooperate in the removal of Brandi Schulze's name from the patent applications for the "Stud Extension" and "Square Tie Wire," despite positive knowledge that Brandi Schulze was not a co-inventor of any of the devices in question. Although Clayton Schulze did eventually agree to execute a petition to the U.S. Patent and Trademark Office to have Brandi Schulze's name removed from the Stud Extension and the "Square Tie Wire" patent applications, this resulted in additional and unnecessary legal fees and expenses for Todd Schulze.

In response to efforts by Attorney LaPointe to have Clayton Schulze's name removed from the pending patent applications, Clayton Schulze directed Attorney Thomson to make filings with the United States Patent and Trademark Office which were designed to, and did, interfere with the progress of the applications of the "Stud Extension" and the "Square Tie Wire" patents. Specifically, in January, 2003, Attorney Thomson, at the direction of Clayton Schulze, filed an application with identical claims to those asserted in the original patent application. This

act was calculated to, and did, cause the U.S. Patent and Trademark Office to issue a Notice of Withdrawal from Issue due to a possible interference.

On July 11, 2003, the Patent Examiners issued a Notice of Suspension of the Issuance of the Patent due to a possibility of an interference proceeding. The patent application for the "Stud Extension" was thus suspended from June, 2003 until November, 2003, when the U.S. Patent and Trademark Office withdrew the "interference" and issued an office action. Clayton Schulze's unwarranted and unjustified interference in the application process thus delayed issuance of the patent for the Stud Extension for approximately fifteen months.

As for the patent application for the "Square Tie Wire", Clayton Schulze contested Todd Schulze's right to exclusive ownership of that patent as well. Clayton Schulze directed Attorney Thomson to file claims which competed with those of Todd Schulze, which caused delay in the process. There eventually came a time when Todd Schulze could no longer pay the various fees necessary to continue to prosecute the patent claim. Clayton Schulze then also abandoned his effort to be named inventor, the rights of any party to patent that invention were forever lost.

Clayton Schulze also initiated the instant litigation. He sued not only Todd Schulze, but also Todd Schulz's' wife and corporations under which Todd and Brandi Schulze conduct their construction business, knowing full well that neither Brandi Schulze nor the corporations had any interest in the patent or patent applications. The damages asserted by the Defendants included $180,000 for some unspecified infringement of the "Stud Extension" patent (which did not and does not yet exist), and $114,000 under the contract with Fukuvi pertaining to the "Slab Saver."

The Defendants took a default judgment on those claims, and executed upon property of the Plaintiff under the authority of that judgment. The property executed upon included the mold

at Springfield Plastics the Plaintiff was using to manufacture "Stud Extensions," and royalty payments from Fukuvi.  When this Court later vacated the Defendants' judgment, the Defendants did not return the mold, and did not discontinue attachment proceedings with respect to the royalty payments until they faced sanctions under Ohio law for fraudulent attachment.

In truth, there was no basis whatsoever for the patent claims asserted by the Defendants in this case.  When called upon to explain why they thought they should be awarded $294,000 dollars in damages against the Plaintiff or his wife, neither Clayton Schulze nor Patricia Schulze had an answer.  They literally could offer no justification whatsoever for their suit.

<u>MERITS OF THE PATENT CLAIMS</u>

Clayton Schulze has admitted that Todd Schulze conceived each of the devices in question.  Clayton Schulze bases his claims to be a co-inventor only upon alleged "improvements" he made to the design originally conceived by Todd Schulze.

The law is clear that "conception" is "the touchstone of inventorship," and each joint inventor must generally contribute to the conception of the invention. *Eli Lilly and Company v. Aradigm Corporation*, 376 F.3d 1352 (Fed. Cir. 2004); *FSU vs. American Bioscience,,* 333 F.3d 1330 (Fed. Cir. 2003), citing *Ethicon, Inc. v. U.S. Surgical Corp.,* 135 F.3d 1456, 1460 (Fed.Cir.1998), *quoting Burroughs Wellcome Co. v. Barr Labs., Inc.,* 40 F.3d 1223, 1227-28 (Fed.Cir.1994).

"Conception" is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice."  *FSU vs. American Bioscience, supra; Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed.Cir.1986), quoting 1 *Robinson on Patents* 532 (1890).  An idea is sufficiently "definite and permanent" when "only ordinary skill would be necessary to reduce the invention

to practice, without extensive research or experimentation." *FSU supra; Ethicon, supra*; *Burroughs Wellcome, supra*.

The putative inventor's contribution to the conception of the invention must be one that is not insignificant in quality, "when that contribution is measured against the dimension of the full invention." *Eli Lilly, supra*, at 1358-1359; *Burroughs Wellcome Co.*, *supra at* 1227. Stated differently, "One does not qualify as a joint inventor merely by assisting the actual inventor." *Eli Lilly, supra* at *1*358-1359; *FSU, supra; American Bioscience*, *supra* at 1330; *Ethicon, supra.*

As respects the "Slab Saver," Clayton Schulze has identified only two "improvements" he claims are his own. Clayton Schulze maintains the original design prepared by Todd Schulze had a ball-shaped insert as well as a nail tab, and that he conceived of the modification of the ball-shaped insert and made it into a "T" shape, and removed the nail tab. Neither of these claims, even if true, would make Clayton Schulze a co-inventor of the "Slab Saver."

The claims listed on the "Slab Saver" patent show that neither the presence or absence of a nail tab is material to the concept of the "Slab Saver." A nail tab is therefore not a claim in the patent, nor could it be. A patent claim cannot, as a matter of law, be base upon the *absence* of a feature. Therefore, even if Mr. Schulze's claim to have "conceived" the removal of the nail tab were true, this is a design choice and not a contribution to the patentable idea.

As to the shape of the head on the stem, Todd Schulze plainly conceived of the "T-shaped" stem, and a number of other shapes of stems, before he even took the proposition to his father. These shapes appear in drawings which Clayton Schulze has admitted were the first drawings Todd showed him of this device. Therefore, the first time Clayton Schulze ever saw the "Slab Saver, the concept was sufficiently clear and definite that "only ordinary skill would be necessary to reduce the invention to practice," without any significant research or

experimentation.  In fact, the product has been manufactured with several kinds of shape to the heads, proving the head shape is a design choice which is entirely incidental to the patented concept.

Further, even if it were true that Clayton Schulze contributed the idea of a "T" head (as opposed to a ball or fish-hook or wedge shape), the shape of the head is entirely incidental to the concept represented by the primary claim.  The shape of the head on the stem of the "Slab Saver" is not part of the patent claim, and its conception could not, therefore, as a matter of law, make Clayton Schulze a co-inventor.

As for the Stud Extension, Defendant Clayton Schulze also claims two design changes he conceived make him a co-inventor.  According to the Defendant, the original design for the Stud Extension made by Todd Schulze was a large flat head with a shaft (like a roofing nail) which was to be glued to the bottom of a "Nelson Stud."  Defendant Schulze's claim is that he added a finger-like device with a hook (three or more fingers) so the extension could be snapped onto the Nelson Stud, and it would secure itself.  The Defendant also purports to have contributed the idea of having serrations along the stem to it could be clipped or broken off at specific intervals.

The idea of putting "score marks" on plastic parts so as to be able to break them off to length is not a novel idea, and would not even be patentable.  As for the "fingers," the Plaintiff will produce the original drawings he took to Clayton Schulze when he first introduced the idea to Clayton Schulze, which drawings show the use of "fingers" for attaching the "Stud Extension" to a Nelson Stud.  The idea was simply not introduced by Clayton Schulze.

*LR. 16.1.4.A.2 –Statement of Damages Claimed and Method of Calculation*

The claims by Clayton Schulze to be a co-inventor, his claims and representations to third parties to be the owner of the "Slab Saver" patent, and his negotiation of "exclusive franchises"

- 21 -

to third parties all constitute deliberate infringement of the Plaintiff's "Slab Saver" patent. Further, Clayton and Patricia Schulze, doing business as "HOBO Construction," sold $83,004.29 worth of patented products upon which Todd Schulze was the only true patent holder. Of that gross amount sold, $44,070.79 was profit, and constitutes lost profits within the meaning of 35 U.S.C. § 284 (allowing damages for lost profits).

This gives rise to statutory damages in the amount of $44,070.79. Due to the willful and malicious nature of the Defendants' infringement, and the fact these infringements were committed while Clayton Schulze owed fiduciary duties to Todd Schulze, an award of treble damages pursuant to 35 U.S.C. § 284 is warranted.

Also due to the breaches by Clayton Schulze of his fiduciary duties toward the Plaintiff, the Plaintiff has unnecessarily incurred two sets of legal fees and related out-of-pocket costs. Defendant Clayton Schulze acted in deliberate bad faith when he insinuated his name on to Todd Schulze's patents, when he refused to cooperate in correcting the names on the patents, and when he asserted frivolous patent claims in hi suit against Todd and Brandi Schulze. Further, the Defendant's acts with respect to the patent applications were carried out during the time the Defendant owed the highest duties of good faith, candor and loyalty to Todd Schulze. The Defendant's bad faith, the fact that he was in a fiduciary position, and the later filing of frivolous litigation against the Plaintiff, make this an "exceptional case" within the meaning of 35 U.S.C. § 285, justifying an award of attorneys' fees in addition to the costs of suit.

The first set of unnecessary fees and costs were those of patent counsel, Dennis LaPointe, whom Todd Schulze was forced to retain to try and correct the patent records and secure Todd Schulze's patent royalties from Fukuvi. Mr. LaPointe advised and assisted the Plaintiff in protecting his interest in the "Slab Saver" patent. He also advised and assisted the Plaintiff in

salvaging "Stud Extension" patent application, which was in danger of being lost entirely due to the fact that Clayton Schulze had caused the name of a non-inventor (Brandi Schulze) to be listed on the patent application.  Mr. LaPointe also tried to save the "Square Tie Wire" patent application, but the Plaintiff simply lacked the resources to combat the relentless machinations of Clayton Schulze, and that patent was lost.

Mr. LaPointe also negotiated on behalf of the Plaintiff with Fukuvi.  He was successful in obtaining copies of the contract documents from Fukuvi, and in an effort to get Fukuvi to pay the Plaintiff's share of the royalties directly to the Plaintiff.  Mr. LaPointe protected the Plaintiff's rights regarding Fukuvi's payment of royalties to an unauthorized third party (Hobo Construction), and has preserved the Plaintiff's right to later take action against Fukuvi for various breaches of the agreement arising from Fukuvi's operation under a forged amendment to the original licensing agreement.  Mr. LaPointe mad reasonable, *albeit* ultimately unsuccessful, efforts to negotiate either a purchase of the patent rights by Fukuvi, or to otherwise extricate the Plaintiff from that agreement.  For these services, the Plaintiff has been obliged to pay the firm of Mason & Associates, P.A., the sum of $22,240.17 in legal fees and out-of-pocket costs.

In 2004, Attorney LaPointe left the firm of Mason & Associates, but continued to work on this matter for Todd Schulze.  In this regard, he has billed Todd Schulze the amount of $2,740.17, over and above what was billed by the firm of Mason & Associates.

The second set of legal fees and out-of-pocket costs are those incurred in connection with this litigation.  In order to have the Defendants' default judgment vacated, resist the Defendants' unlawful efforts to execute on their judgment after it had been vacated, and in prosecuting the Plaintiff's claims to ownership of the patents, the Plaintiff has incurred legal fees and out-of-

pocket costs, through June 30, 2005, in the amount of $102,233.63. Such fees and costs will continue to accrue to the time of judgment in this case.

Additional damages are due to Todd Schulze by reason of Clayton Schulze failing to properly account for, and pay over, royalties derived from the exploitation of the "Slab Saver" through the license agreement with Fukuvi. A detailed accounting showing how this amount is calculated is attached to this Pretrial Narrative, labeled "Accounting of Payments To and From Clayton Schulze/HOBO Construction" (also marked for identification as Exhibit No. 137).

In summary, the Plaintiff's damages include:

| | | |
|---|---|---|
| Amount expended by Defendants to produce Slab Saver | **26,743.83** | |
| Amount expended by Defendants to produce Stud Extensions | **12,429.67** | |
| | | |
| Amount received by Defendants from sale of Slab Saver | | **54,438.06** |
| Amount received by Defendants from sale of Stud Extensions | | **8,807.33** |
| Subtotals: | **$39,173.42** | **$63,245.39** |
| Net Profit to Defendants From Sale of Patented Products = | **$24,071.97** | |

### **Damage Calculation**

| | |
|---|---|
| Lost Profit, Trebled Pursuant to 35 U.S.C. Sec. 284: | **$72,215.91** |
| Credit For Amounts spent by Defendants on Patent Applications: | **($17,865.00)** |
| Credit for Amounts Paid To Or For The Benefit Of Todd Schulze: | **($9,673.00)** |
| Amount Defendants Still Owe on Royalties from Fukuvi: | **$4,125.00** |
| **Principal Amount of Damages** (before prejudgment interest and costs) | **$96,287.88** |

| | |
|---|---|
| **Legal Fees for Patent Counsel =** | **24,983.72** |
| **Legal Fees for Litigation Counsel (to June 30, 2005) =** | **102,233.63** |
| **TOTAL DAMAGES =** | **$223,505.23** |

To these specific amounts will be added additional legal fees and costs incurred between now and the time of trial, and for the trial itself.

*LR. 16.1.4.A.3 –Witness List*

The Plaintiff expects to call the following witnesses at the trial of this case:

Todd M. Schulze                                   Liability and damages.
2313 East Carson St., Suite 201
Pittsburgh, PA   15203
(412) 381-8100

Brandi Elliot Schulze                            Liability and damages.
2313 East Carson St., Suite 201
Pittsburgh, PA   15203
(412) 381-8100

Clayton E. Schulze                               Liability.
8282 McKee Road
Albion, PA   16401
(814) 922-3000

Patricia Schulze                                    Liability
8282 McKee Road
Albion, PA   16401
(814) 922-3000

Richard K. Thomson, Esq.                    Liability
7691 Fairlane Drive
Fairview, PA   16415
(814) 474-9016

Dennis G. LaPointe, Esq.                      Liability and Damages
Mason & Associates, PA                        Mr. LaPointe is being called as
17757 U.S. Hwy. 19N – Suite 500           both a fact witness and an expert
Clearwater, FL   33764                          on patent law.
(727) 538-3800

- 25 -

Designated Representative of
FUKUVI USA                                          Damages.  (The testimony of the
7631 Progress Court                                 Fukuvi Representative will be by
Huber Heights, OH   45424                           way of deposition transcript.)
(937) 236-7288


*LR. 16.1.4.A.4 –Designation of Witnesses to Appear by Deposition*

The Plaintiff does not anticipate the facts to which the representative of Fukuvi USA, Inc.

testified will be disputed, and is seeking a stipulation to those facts.  If no such stipulation can be

reached, however, the Plaintiff anticipates presenting the testimony of a representative of Fukuvi

U.S.A., Inc. by deposition transcript.


*LR. 16.1.4.A.5 –Identification of Documents*

Attached to this Pretrial Narrative Statement are two separate lists of documents.  The

first is labeled "Plaintiff's List of EXHIBITS THE PLAINTIFF EXPECTS TO OFFER Pursuant

to L.R. 6.1.4."  Those are the documents the Plaintiff expects to offer into evidence.

The second list is labeled "Plaintiff's List of DOCUMENTS THE PLAINTIFF MAY

OFFER IF THE NEED ARISES Pursuant to L.R. 16.1.4."  These are documents the Plaintiff

does not intend to offer in his case-in-chief, but which may be offered in rebuttal, for purposes of

cross-examination, or if the need otherwise arises.  The Plaintiff may also use any document

produced by the Defendants at trial.

*LR. 16.1.4.A.5 –Identification of Legal Issues*
*Which Should Be Addressed at Final Pretrial Conference*

The legal issues which the Plaintiff previously identified in this action have since been

addressed by the Court.  One was to present a claim construction, which has now been

accomplished by stipulation.  The other had to do with the burdens of proof applicable to the

Plaintiff's common law and patent claims, and the parties have separately briefed those issues at the direction of the Court.

### *LR. 16.1.4.A.7 – Expert Disclosures Pursuant to F.R.Civ.P. 26(a)(2)*

Because this case was commenced before the effective date of Rule 26(a)(2), this case has not been administered under that Rule. There have therefore been no such disclosures by any of the parties to this case.

### *LR. 16.1.4.A.7 – Copies of Reports of Physicians*

Because this case does not involve claims of personal injury, there are no physicians reports.

Respectfully submitted,

_____
Peter N. Georgiades (Pa. I.D. No. 25554)
Greystone Legal Associates, P.C.
Birmingham Place - Suite 201
2313 East Carson Street
Pittsburgh, Pa. 15203
(412) 381-8100

Attorneys for the Plaintiff.